UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re NORTEL NETWORKS CORP.              :     01 Civ. 1855 (RMB)
SECURITIES LITIGATION                            :
                                                                    :     **DECISION & ORDER APPROVING**
                                                                    :     <u>**NORTEL I SETTLEMENT**</u>
                                                                    :
------------------------------------------------------------------X

**I.      Introduction**

This consolidated securities law action was initiated on February 16, 2001 ("Nortel I") by a class of plaintiffs ("Plaintiffs," "Class," or "Class Members") who purchased common stock or call options or sold put options on the common stock of Nortel Networks Corporation ("Nortel") during the period from October 24, 2000 through February 15, 2001 ("Class Period").[1]  (<u>See</u> Lead Plaintiff's Memorandum of Law in Support of Final Approval, dated Sept. 5, 2006 ("Pl. Mem."), at 3.)  On January 18, 2002, Ontario Public Service Employees' Union Pension Plan Trust Fund ("OPTrust" or "Lead Plaintiff") filed a Second Consolidated Amended Class Action Complaint ("Amended Complaint") contending that during the Class Period Nortel "knowingly and recklessly issued a series of materially false and misleading statements and engaged in a variety of accounting manipulations" that artificially inflated the price of Nortel's common stock.  (<u>See</u> Amended Complaint, dated January 18, 2002, at ¶ 2).  Lead Plaintiff asserted claims under Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Nortel and three of its executives, John Roth, Clarence Chandran, and Frank Dunn

---

[1] Beginning in February 2001, similar securities actions were filed against Nortel and its officers in Ontario, Quebec, and British Columbia ("Nortel I Canadian Actions") on behalf of persons resident in Canada.  (<u>See</u> Pl. Mem. at 3.)  Beginning on March 17, 2004, separate securities class actions, involving allegations similar to those in Nortel I, were filed in the United States against Nortel and its officers for the period April 24, 2003 through April 27, 2004 ("Nortel II").  (<u>See</u> <u>id</u>.)  There are also several actions currently pending in Canada which are similar to Nortel II ("Nortel II Canadian Actions").  (<u>See</u> <u>id</u>.)

(collectively, "Defendants").

On September 5, 2006, Lead Plaintiff moved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and with respect to Nortel I, for approval of a Stipulation and Agreement of Settlement ("Settlement") in the approximate amount of 1.14 billion dollars.  (See Pl. Mem. at 1-2.)  Lead Plaintiff also moved for approval of a proposed plan of allocation among Class Members ("Proposed Plan of Allocation").[2]  (See Pl. Mem. at 1-2.)  In or about July 2006, notices regarding the Settlement had been mailed to Class Members pursuant to an order, dated June 29, 2006, preliminarily approving the proposed Settlement and form of notice.  (See Preliminary Order for Notice and Hearing in Connection with Settlement Proceedings, dated June 29, 2006 ("Preliminary Approval Order"), ¶¶ 3-4.)  From approximately August 10, 2006 through September 28, 2006, the Court received (very few) written objections ("Objections") from Class Member Objectors ("Objectors") and non-Class Members to the Settlement.  (See Affidavit of David A. Isaac Regarding Exclusion Requests and Objections Received for Nortel I, dated Oct. 3, 2006 ("Isaac Aff."), Ex. C.)[3]  On October 4, 2006, Lead Plaintiff filed a response to the Objections.  (See Lead Plaintiff's Reply Memorandum of Law in Further Support of Final Approval of Settlement, dated Oct. 4, 2006 ("Pl. Supp. Resp.").)

On October 26, 2006, the Court held a "fairness" hearing (jointly with Judge Preska who presided over the Nortel II proceedings) pursuant to Fed. R. Civ. P. 23(e)(1)(C) at which the Court heard from the one Objector who was present as well as from Lead Plaintiff and Defendants.[4]  (See

---

[2] The Settlement and Proposed Plan of Allocation in Nortel I, as well as the settlement currently pending before United States District Judge Loretta A. Preska in Nortel II, came about, in no small measure, through the assistance of Senior United States District Judge Robert W. Sweet.

[3] In total, the Court received 35 Objections, representing approximately 0.0025% when compared to the 1.4 million notices distributed.  (See Isaac Aff. ¶¶ 2, 7.)

[4] The Court also heard from Canadian Class Counsel and the attorneys for the Indiana Electrical Workers' Pension Trust Fund IBEW and Laborers' Local 100 Pension Fund which are plaintiffs in certain Canadian (derivative) lawsuits.  (See Tr. at 45, 61.)

Transcript of Fairness Hearing, dated Oct. 26, 2006 ("Tr.").)

**For the reasons set forth below, the motion for final approval of the Settlement and Proposed Plan of Allocation is granted.**

## II.    Background

Approximately twenty-four securities class actions were filed following Nortel's issuance, on February 15, 2001, of a press release, "dramatically lowering [Nortel's] guidance for the first quarter and fiscal year 2001." (Compl. ¶ 165.) On October 16, 2001, the Court consolidated these actions pursuant to Fed. R. Civ. P. 42(a). (See Order Consolidating Actions, Appointing Lead Plaintiffs and Approving Selection of Co-Lead Counsel, dated Oct. 16, 2001 ¶ 1). On February 4, 2002, the Court appointed OPTrust as Lead Plaintiff and affirmed its choice of Milberg, Weiss, Bershad & Schulman LLP ("Milberg Weiss") as Lead Counsel. (See Decision and Order, dated Feb. 4, 2002, at 1 ("[T]he Court hereby…affirms its choice of (lead) counsel, Milberg Weiss, as sole lead Plantiff's counsel….).)

The Amended Complaint alleges, among other things, that five statements made by Defendants were false and misleading when made, including: (1) an October 24, 2000 Nortel press release, (2) Nortel's third quarter 2000 financial results, (3) a November 1, 2000 Nortel press release, (4) a December 14, 2000 Nortel press release, and (5) Nortel's fourth quarter and year-end 2000 financial results. (See, e.g., Compl. ¶ 77 ("[D]efendants' statements in the October 24, 2000 press release regarding expected growth in revenues and earnings for 2000…and 2001…were materially false and misleading when made."), ¶ 163 ("[D]efendants engaged in a number of accounting improprieties which caused the Company's financial results for the fourth quarter and year-end 2000…to be materially enhanced and misstated in violation of GAAP and SEC reporting rules.").)

Lead Plaintiff sought certification of a class "consisting of all persons and entities who,

during the period October 24, 2000 and continuing through and including February 15, 2001, purchased Nortel common stock or call options or sold Nortel put options, and who suffered damages thereby, including, but not limited to, those persons who traded in Nortel Securities on the New York Stock Exchange and/or the Toronto Stock Exchange." (Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, dated March 21, 2003, at 7.) On September 5, 2003, the Court granted class certification. See In re Nortel Networks Corp. Sec. Litig., No. 01 Civ. 1855, 2003 WL 22077464, at *1 (S.D.N.Y. Sept. 8, 2003) ("For the reasons stated herein, the Court grants OPTrust's motion to certify the class.").

In or about September 2005, following the resolution of Defendants' motion to dismiss, filed in or about April 2002, and after initial discovery, the parties entered into settlement discussions and selected Senior United States District Judge Robert W. Sweet to oversee their negotiations. (See Order of District Judge Richard M. Berman and District Judge Loretta A. Preska, dated Sept. 29, 2005, at 1 ("Pursuant to the parties' letter dated September 16, 2005, the Honorable Robert W. Sweet has graciously agreed to oversee settlement negotiations in these actions.").) Following an intensive series of settlement talks, on June 20, 2006 the parties entered into a proposed "global" settlement, covering Nortel I, Nortel I Canadian Actions, Nortel II, and Nortel II Canadian Actions, (see Stipulation and Agreement of Settlement (Nortel I), dated June 20, 2006 ("Settlement")). As noted, on June 29, 2006, the Court entered an order preliminarily approving the proposed Settlement and the form and manner of notice to the Class. (See Preliminary Approval Order ¶¶ 3-4.)

The Settlement (and Preliminary Approval Order) provide, in part, the following:

- On June 1, 2006, Nortel paid to the Escrow Agents as agents for the benefit of the Class $290,162,428.48. (Settlement ¶ 4(a).)

- Nortel agreed to issue and deliver 314,333,875 shares of common stock of Nortel valued at approximately $704 million as of June 30, 2006. (Settlement ¶ 4(d); Pl.

-4-

Mem. at 1 n.2.)

- Nortel agreed to contribute to the Settlement one-quarter of the amount of any actual recovery by Nortel as a result of the action commenced by Nortel against Frank Dunn, Douglas Betty, and Michael Gollogly in the Ontario Superior Court of Justice bearing Court File No. 05-CV-283095PDI.  (Settlement ¶ 4(e).)

- Nortel will adopt certain corporate governance changes within sixty days after the effective date of the Settlement, (Settlement ¶ 4(f)), including, without limitation, (i) its Compensation and Human Resources Committee ("CHRC") will have "sole authority over the engagement of compensation consultants," (ii) Nortel will disclose the names of companies used "for the purposes of pay setting and performance comparisons," (iii) CHRC will disclose "pay for performance measures and the time period(s) used to assess management's performance," and (iv) CHRC will establish "its compensation structures and policies in line with best practices."  (Affidavit of Neil L. Zola Regarding the Mailing of the Nortel I Settlement Notice and Proof of Claim Form, dated Sept. 1, 2006, Ex. A: Notice).

- The Claims Administrator, The Garden City Group, Inc. ("GCG"), will mail the Notice of Certifications in Canada and Proposed Settlements of Class Actions, Motions for Attorneys' Fees and Settlement Fairness Hearing (Nortel I Notice)" ("Notice") and "Proof of Claim and Release" to all known Class Members. (Preliminary Approval Order ¶¶ 4-5.)

- The proposed Plan of Allocation among the Settlement Class and Subclasses as described in the Notice.  (Preliminary Approval Order Ex. 4.)

- Lead Plaintiffs' Counsel agreed, as part of the Settlement, to move "for an award to counsel of attorneys' fees in cash and shares in an amount not to exceed ten percent (10%) of the Gross Settlement Fund."  (Settlement at Ex. A1, at 3.)

The claims administrator, GCG, effected notice of the Settlement by mailing over 1,448,000 copies of the Notice to Class Members.  (See Isaac Aff. ¶ 2.)  As of October 3, 2006, GCG had received 217 requests to opt-out of the Settlement and 35 Objections to the Settlement; 22 objections came from (verifiable) Class Members; the remaining 13 objections came from individuals who are not Class Members.  (See Pl. Supp. Response at 2; Isaac. Aff. ¶¶ 4, 7.)[5]

---

[5]    Approximately 26 of the Objections relate to the Settlement and 9 relate to legal fees.  (See, e.g., Letter from Patricia M. Ager to GCG, dated August 28, 2006 ("To do anything else than a full disclosure and judge's determination of justice may be in the best interests of litigators, the courts, and Nortel it is not, in my opinion, in the best interest of the Nortel investor.  Should the end result of a court process result in liquidation and sale of Nortel and it's assets be the case so be it."); Letter

At the October 26, 2006 Fairness Hearing, the Court first heard from the one Objector in attendance, Rinis Travel Service, who objected to proposed Class Counsel legal fees as "grossly excessive" and the Settlement Notice as "deficien[t]." (Tr. at 3, 8; see also Rinis Travel Service Objections, dated September 19, 2006, at 3 ("The Notice contains no disclosure of the size of the class, the number of shares involved, … the average loss per share per class member, the amount of the alleged damages asserted on behalf of the class … thereby precluding class members from making an informed judgment regarding opting out, objecting, or standing pat.").) Thereafter, Lead Plaintiff spoke in favor of the Settlement. (Tr. at 27 ("[T]his is an excellent settlement for the class and one that the plaintiff enthusiastically endorses."), 26 ("I think it's fair to say that a home run in this case, assuming the company could have survived it, which I don't think they could have, would have been several billion dollars, certainly less than 10 but certainly several billion dollars."), 27 ("most of the company's available cash and essentially all of the available insurance went towards settling this case.").)[6]

## III. Legal Standard

In determining whether to approve a class action settlement, the district court must determine whether it is "fair, adequate, and reasonable, and not a product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000). "The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). Judicial discretion

---

from Mary DiStefano to GCG, dated September 25, 2006 ("The compensation offered is too small a percentage of what the investor risked, taking into consideration that some investors invested their retirement funds.").)

[6] Prior to the Fairness Hearing, Quebec Counsel Unterberg Labelle Lebeau, Belleau Lapointe, and Trudel & Johnston (collectively "QCC"), requested that the Court require Lead Counsel to disclose certain "fee sharing" agreements between Lead Counsel and co-counsel, including Koskie Minsky LLP and Abraham, Fruchter & Twersky. On November 21, 2006, the Court ordered Milberg Weiss to disclose these agreements by December 8, 2006. (See Order, dated November 21, 2006.)

should be exercised in light of "the general policy favoring the settlement of litigation." Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982).

District courts first review the negotiating process that produced the settlement to ensure: (1) that the settlement was the product of arm's length negotiations; and (2) that class counsel "'possessed the experience and ability, and . . . engaged in the discovery, necessary to effective[ly] represent[ ] . . . the class's interests.'" D'Amato, 236 F.3d at 85 (quoting Weinberger, 698 F.2d at 74). Once the court determines that the settlement is procedurally fair, adequate and reasonable, it must determine whether the settlement is substantively fair, adequate and reasonable by considering the following nine factors enumerated initially in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

D'Amato, 236 F.3d at 86 (citations omitted).

**IV.    Analysis**

**Settlement Negotiating Process**

Lead Counsel has extensive experience in handling complex plaintiffs' class actions, and the Court has no reason to doubt that the Settlement was the product of extended "arm's length" negotiations, including, among other things, protracted negotiations overseen by Judge. Sweet. (See Pl. Mem. at 5 ("The Settlement negotiations were vigorous and protracted …")); see also States of N.Y. and Md. v. Nintendo of America, Inc., 775 F. Supp. 676, 680-81 (S.D.N.Y. 1991); (Report by the Honorable Robert W. Sweet, dated June 26, 2006, at 8 ("Lead Plaintiff's Counsel has conducted

investigations relating to the claims and underlying event and transactions alleged in the Nortel I U.S. Action. Lead Plaintiff's Counsel has analyzed the evidence adduced during pretrial discovery and has researched the applicable law with respect to the claims of the Lead Plaintiff and the Class against the Defendants and the potential defenses thereto.").) Where, as here, "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation, the Settlement will enjoy a presumption of fairness." In re Austrian and German Bank Holocaust Litigation, 80 F.3d 78 (2d Cir. 2001).

**Grinnell Factors**

The nine Grinnell factors clearly favor approval of the Settlement, as follows:

The first Grinnell factor favors the Settlement because the action involves litigation of "complex and difficult issues with regard to jurisdiction, liability, causation and proof of damages." (Pl. Mem. at 9.) Significant additional time, effort, and expense would be incurred were the case to go forward, including, among other things, extensive discovery, much of which would take place outside the Court's subpoena power in Canada, expert reports, (likely) summary judgment motions, and ultimately a lengthy trial. See, e.g., In re Visa Check/ Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003) (describing potential for "enormous expense" in proceeding to trial), aff'd sub nom Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96 (2d Cir. 2005).

The second Grinnell factor – i.e., "reaction of the class to the settlement" – favors approval of the Settlement. For one thing, all of the Objectors were, relatively, holders of small amounts of stock, individually and collectively, and none were large (institutional) investors. (See Pl. Supp. Response at 6.) Additionally, in response to over 1.4 million separately mailed Settlement Notices, only 217 Class Members opted out of the Settlement (approximately 0.015%) and only 35 Objections were received (approximately 0.0025%). See, e.g., D'Amato, 236 F.3d at 86-87 ("The District Court properly concluded that this small number of objections weighed in favor of

settlement."); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 478, 482 n.20 (S.D.N.Y. 1998) (describing as "minimal" 3,874 opt-outs from a class of over one million, or .39%). The Notice contains all necessary and required information so that Class members can make an informed decision, (see Preliminary Order at 4), including, among other things, the terms of the Settlement and the amount of shares traded during the Class Period. See, e.g., Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982); In re Milken and Associates Securities Litigation, 150 F.R.D. 46, 52 (S.D.N.Y. 1993) ("Normally, settlement notices need only describe the terms of the settlement generally. Here, the Settlement notices went well beyond this minimal requirement and described in detail a variety of important matters relating to the litigation and to the proposed Settlement."). And, the Rinis Objector's statement that the Settlement notice does not provide adequate information is not persuasive. (See Tr. at 10); see also Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("The appearance and argument by counsel on behalf of these objectors at the fairness hearing belies their claim that the notice denied them the opportunity [to] object . . . .").

The third Grinnell factor – i.e., "the stage of the proceedings and the amount of discovery completed" – also supports the Settlement.[7] Lead Counsel has, among other things, reviewed almost 2 million pages of documents, deposed 12 parties and non-parties, and has produced numerous documents to, and been deposed by, Defendants. (See Pl. Mem. at 11; Joint Declaration of Sanford P. Dumain, Daniel B. Scotti and Murray Gold in Support of Proposed Class Action Settlement, Plan of Allocation, and Petition for an Award of Attorneys' Fees and Reimbursement of Expenses, dated Sept. 5, 2006 ("Pl. Decl."), ¶¶ 48-64, 103.) Plaintiffs have "sufficient information

---

[7] As noted, the Amended Complaint has survived Defendants' motion to dismiss, see In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 617 (S.D.N.Y. Jan. 3, 2003) ("[T]he Court…denies Defendants' motion to dismiss the Nortel Complaint."), and the Court granted class certification over Defendants' objections, see In re Nortel., 2003 WL 22077464, at *1 ("[T]he Court grants Plaintiff's motion for class certification[.]").

to make an informed judgment on the reasonableness of the settlement proposal." Diamond v. Fogelman, No. CV-90-0900, 1992 WL 167271, at *4 (E.D.N.Y. June 26, 1992).

The fourth through seventh Grinnell factors – i.e., the risks faced by the Class in establishing liability and damages, in maintaining the action through trial, and in collecting upon any judgment – all favor the Settlement. That is, Plaintiffs face significant litigation risks because, among other things: (i) Plaintiffs would have to prove that Nortel's forward guidance and accounting were materially false and misleading; (ii) "the difficulties and complexities of issues relating to proof of loss causation and damages were very real"; and (iii) Nortel might not be able financially to survive two liability and damage judgments resulting from Nortel I and Nortel II (which could potentially have exposed Nortel to multi-billion dollar liability.) (Pl. Mem. at 9, 15; see Pl. Decl. ¶¶ 90-105.)

The eighth and ninth Grinnell factors relating to "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation" also favor the Settlement. See Grinnell, 495 F.2d at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.") (citations omitted). The $1.14 billion Settlement represents about 10% of Lead Plaintiff's original $10 billion estimate of the maximum possible damages. (See Tr. at 14 ("The settlement consideration…is valued at over $1.1 billion."), 26 ("I think it's fair to say that a home run in this case, assuming the company could have survived it, which I don't think they could have, would have been several billion dollars, certainly less than 10 but certainly several billion dollars."), 27 ("most of the company's available cash and essentially all of the available insurance went towards settling this case"); Pl. Mem. at 16 ("[T]he Nortel I Class's damages could potentially be measured as high as $10 billion.")

Thus, taking into account all of the Grinnell factors, the Court finds the Settlement to be fair, reasonable, and adequate to the Class.

-11-

The Court also approves the Plan of Allocation (see page 5, supra) because, among other reasons, it was negotiated at arm's length among representatives of the Class and Defendants, and it is supported by experienced and competent counsel (and overseen by Senior United States District Judge Robert W. Sweet). See, e.g., In re American Bank Note Holographics, Inc., 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (approving settlement plan of allocation because, among other things, "the opinion of experienced and informed counsel is entitled to considerable weight.").

## V. Conclusion and Order

For the foregoing reasons, the motion [#178] for final approval of the Settlement and Proposed Plan of Allocation is granted.

Dated: New York, New York
       December 26, 2006



RICHARD M. BERMAN, U.S.D.J.